UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ATLANTIC SPECIALTY INSURANCE )
COMPANY, )
)
        Plaintiff, )        CIVIL ACTION NO.
)
VS. )        3:20-CV-2478-G
)
DELMA JEFFERSON, )
)
        Defendant. )

## MEMORANDUM OPINION AND ORDER

Before the court is the defendant Delma Jefferson ("Jefferson")'s Rule 12(b)(2)

motion to dismiss for lack of personal jurisdiction. *See* Notice of Motion and Motion

of Defendant To Dismiss Plaintiff's Complaint For Lack of Personal Jurisdiction,

Under Federal Rules of Civil Procedure 12(b)(2) ("Motion") (docket entry 10).  For

the reasons set forth below, the motion is granted.

I.  BACKGROUND

A.  Factual Background

The relationship between Jefferson and the plaintiff, Atlantic Specialty

Insurance Company ("Atlantic"), began in either 2017 or 2018 when Jefferson

-1-

purchased an Occupational Accident Certificate of Insurance from Atlantic.  *See* Memorandum of Points and Authorities in Support of Motion to Dismiss for Lack of Personal Jurisdiction ("Memorandum") (docket entry 11) at 2; Declaration of Delma Lamar Jefferson in Support of Motion to Dismiss for Lack of Personal Jurisdiction ("Jefferson Declaration") (docket entry 12) at 1.  At that time, Jefferson was living in Northern California (where he moved in 2017 and remains domiciled) working as an Uber driver.  *See* Memorandum at 2.  Jefferson drove and worked exclusively in the Northern California area.  *See* Jefferson Declaration at 1.  Jefferson purchased the insurance policy to cover "any disability of Jefferson that arose from his activities as an Uber driver."  Memorandum at 2.  The policy provides occupational accident coverage through Temporary Total Disability ("TTD"), Accident Medical Expense ("AME"), and Continuous Total Disability ("CTD") benefits.  *See* Complaint for Declaratory Judgment ("Complaint") (docket entry 1) at 2-6.

According to the complaint, the TTD and AME benefits both have 104 week limits.  *See* Complaint at 2-7.  Further, the policy requires that Jefferson "be granted a Social Security Disability Award within two years of his alleged injury in order to be eligible for Continuous Total Disability ("CTD") benefits."  *Id*. at 7.

Jefferson was injured in an accident while driving for Uber on June 28, 2018. *See* Plaintiff's Response to Defendant's Notice of Motion and Motion of Defendant to Dismiss Plaintiff's Complaint for Lack of Personal Jurisdiction, Under Federal

Rules of Civil Procedure 12(b)(2) and Memorandum of Points and Authorities in
Support ("Response") (docket entry 17) at 1.  Jefferson subsequently made a claim
under the policy.  Memorandum at 2.  Atlantic allegedly paid TTD benefits to
Jefferson starting on July 5, 2018 and continuing for 104 weeks.  *See* Response at 2.
Similarly, Atlantic allegedly paid AME benefits to Jefferson for a time period
beginning the date of the accident, June 28, 2018, and ended 104 weeks later on
June 28, 2020.  See *id*.  Atlantic alleges that Jefferson has exhausted the 104 week
benefit period for both the TTD and AME benefits in June 2020.  *See* Complaint at
7.  Atlantic further alleges "[Jefferson] has not been granted a Social Security
Disability Award and the two-year requirement for obtaining the award has passed."
*Id*.

Jefferson spent part of his convalescence during the 104 week benefits period
living in his mother's home in Texas.  *See* Jefferson Declaration at 2.  Though
Jefferson received initial medical treatment in San Francisco, he subsequently
received the majority of his treatment from medical professionals in Texas.  *See*
Response at 5-7.  Jefferson submitted the records from those treatments to Atlantic in
order to receive TTD and AME benefits.  See *id*.  Jefferson also requested that
payments and correspondence be mailed to a Texas address for much of the
convalescence period.  *Id*. at 7.  Jefferson states that "the majority of my time since
the accident has been spent in California, and my residence throughout that time has

always been in California." *See* Jefferson Declaration at 2.  Jefferson has neither

worked nor been domiciled in Texas since 2017.  *See* Memorandum at 3.

Atlantic now alleges that despite having exhausted his benefits under the

policy, Jefferson claims he is entitled to an extension of benefits.  *See* Complaint at 7.

Atlantic believes it has fulfilled its obligations under the policy.  *Id.*  That dispute is

the subject of this litigation.

B.  Procedural Background

Atlantic filed this suit on August 21, 2020, seeking declarations (1) that "the

Policy only provides coverage for TTD and AME for a period of 104 weeks; (2) . . .

that [Atlantic] has provided TTD and AME benefits to [Jefferson] for the maximum

time period of 104 weeks; (3) . . . that . . . Jefferson is not entitled to CTD benefits

under the Policy . . . ."  Complaint at 8.  On November 21, 2020, the court issued a

show cause order because Atlantic had yet to serve Jefferson.  *See* Electronic Order

(docket entry 5).  The court eventually granted Atlantic's request for substituted

service on December 31, 2020.  *See* Order (docket entry 9).  Jefferson filed the

instant motion to dismiss on February 1, 2021.  *See* Motion.  Atlantic responded on

March 9, 2021.  *See* Response.  Jefferson did not reply.  The motion is therefore

briefed and ripe for determination.

## II.  ANALYSIS

### A.  Rule 12(b)(2) Motion to Dismiss: Legal Standard

#### 1.  *The Factual Standard: Prima Facie Case*

When a nonresident defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident.  *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir.), *cert. denied*, 513 U.S. 930 (1994); *Gardemal v. Westin Hotel Company*, 186 F.3d 588, 592 (5th Cir. 1999).  If the district court chooses to decide the matter without an evidentiary hearing, the plaintiff may meet its burden by presenting a *prima facie* case for personal jurisdiction.  *Wilson*, 20 F.3d at 648; *Gardemal*, 186 F.3d at 592.

The court will take the allegations of the complaint as true, except where they are controverted by opposing affidavits, and all conflicts in the facts are resolved in favor of the plaintiff.  *Wilson*, 20 F.3d at 648; *Gardemal*, 186 F.3d at 592.  In making its determination, the court may consider affidavits, interrogatories, depositions, oral testimony, or any combination of recognized discovery methods.  *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998); *Thompson v. Chrysler Motors Corporation*, 755 F.2d 1162, 1165 (5th Cir. 1985).  The court is not required to accept as true conclusory allegations, even if uncontroverted, in its prima-facie-case analysis.  *Panda Brandywine Corporation v. Potomac Electric Power Company*, 253 F.3d 865, 869 (5th Cir. 2001).

2. *Legal Requirements*

A federal district court may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state permits the exercise of personal jurisdiction over the defendant; and (2) the exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution. *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002). A defendant is amenable to the personal jurisdiction of a federal court sitting in diversity to the same extent that it would be amenable to the jurisdiction of a state court in the same forum. *Pedelahore v. Astropark, Inc.*, 745 F.2d 346, 347 (5th Cir. 1984). Applying state law, this court must first determine whether Texas, the forum state, could assert long-arm jurisdiction. *Id*. Because the Texas long-arm statute confers jurisdiction to the limits of the federal constitution, *Access Telecom, Inc. v. MCI Telecommunications Corporation*, 197 F.3d 694, 716 (5th Cir. 1999), *cert. denied*, 531 U.S. 917 (2000); *Hall v. Helicopteros Nacionales de Colombia, S.A.*, 638 S.W.2d 870, 872 (Tex. 1982), *rev'd on other grounds*, 466 U.S. 408 (1984), the court need only concern itself with the federal due process inquiry. *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999); *Wilson*, 20 F.3d at 647 n.1; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 17.041, *et seq.* (Texas long-arm statute).

3. *Due Process Requirements*

Due process requires the satisfaction of three elements to exercise personal jurisdiction over a nonresident defendant: (1) the nonresident must have some minimum contact with the forum that results from an affirmative act on its part such that the nonresident defendant could anticipate being haled into the courts of the forum state; (2) the claim must arise out of or be related to those activities; and (3) it must be fair or reasonable to require the nonresident to defend the suit in the forum state. *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir.), *cert. denied*, 548 U.S. 904 (2006); see also *Burger King Corporation v. Rudzewicz*, 471 U.S. 462, 474-78 (1985). The Due Process Clause ensures that persons have a "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Burger King*, 471 U.S. at 472 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring)).

To establish minimum contacts with the forum, a nonresident defendant must do some act by which it "purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 474-75 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The unilateral activity of one asserting a relationship with the nonresident defendant does not satisfy this requirement. *Burger King*, 471 U.S. at 474 (quoting *Hanson*, 357 U.S. at 253); *Helicopteros Nacionales de Colombia, S.A. v.*

-7-

*Hall*, 466 U.S. 408, 417 (1984) (citing *Kulko v. California Superior Court*, 436 U.S. 84, 93-94 (1978)); *Hanson*, 357 U.S. at 253.  In determining whether the exercise of jurisdiction is appropriate, the Supreme Court has focused less on the defendant's presence in the forum state as a means to establish jurisdiction and looked increasingly to whether a defendant's contacts with the forum state make it reasonable to require the defendant to defend the particular suit in that forum.  *Quill Corporation v. North Dakota*, 504 U.S. 298, 307 (1992).

Two types of *in personam* jurisdiction may be exercised over a nonresident defendant: specific jurisdiction and general jurisdiction.  Specific jurisdiction exists if the cause of action is related to, or arises out of, the defendant's contacts with the forum state and those contacts meet the due process standard.  *J.R. Stripling v. Jordan Production Company, LLC*, 234 F.3d 863, 871 (5th Cir. 2000) (quotations and citations omitted).  "When a court exercises personal jurisdiction over a defendant based on contacts with the forum related to the particular controversy, the court is exercising 'specific jurisdiction.'"  *Holt Oil & Gas Corporation v. Harvey*, 801 F.2d 773, 777 (5th Cir. 1986) (citations omitted), *cert. denied*, 481 U.S. 1015 (1987).  A defendant's contacts with the forum that are unrelated to the underlying controversy cannot support a finding of specific jurisdiction.  *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, __ U.S. __, 137 S. Ct. 1773, 1781 (2017) ("[a] corporation's 'continuous activity of some sorts within a state . . . is not enough

-8-

to support the demand that the corporation be amenable to suits unrelated to that activity") (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 927 (2011)).  General jurisdiction, on the other hand, may be found when the nonresident's contacts with the forum are "so continuous and systematic as to render [the nonresident] essentially at home in the forum [s]tate." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (internal quotations and citations omitted).

Under either a specific or general jurisdiction analysis, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum [s]tate." *Burger King*, 471 U.S. at 474 (quoting *International Shoe Company v. State of Washington, Office of Unemployment Compensation and Placement*, 326 U.S. 310, 316 (1945)).  The "purposeful availment" requirement of the minimum contacts inquiry "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts . . . or of the 'unilateral activity of another party or a third person.'" *Id.* at 475 (citations omitted).  A plaintiff must establish a substantial connection between the nonresident defendant and the forum state.  *Jones v. Petty-Ray Geophysical, Geosource, Inc.*, 954 F.2d 1061, 1068 n.9 (5th Cir.), *cert. denied*, 506 U.S. 867 (1992); *Bearry v. Beech Aircraft Corporation*, 818 F.2d 370, 374 (5th Cir. 1987) (citing *Burger King*, 471 U.S. at 475 n.18; *McGee v. International Life Insurance Company*, 355 U.S. 220, 223 (1957)).

A court must consider all factors when making the purposeful availment

inquiry: "no single factor, particularly the number of contacts, is determinative."

*Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). "[W]hether the minimum

contacts are sufficient to justify subjection of the non-resident to suit in the forum is

determined not on a mechanical and quantitative test, but rather under the particular

facts upon the quality and nature of the activity with relation to the forum state."

*Mississippi Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1006 (5th Cir. 1982);

see also *Coats v. Penrod Drilling Corporation*, 5 F.3d 877, 884 (5th Cir. 1993), *cert.*

*denied*, 510 U.S. 1195 (1994).

## B.  Application

The jurisdictional facts of this case, outlined above, can be summarized as

follows: two non-resident parties (the plaintiff a citizen of New York and Minnesota,

the defendant a citizen of California) dispute whether Texas is a constitutionally

appropriate forum to settle a dispute over a contract signed in California, largely

centered around California, but partially performed in Texas.

Jefferson, the non-resident defendant, argues that Texas courts do not have

jurisdiction over this matter because the contract at the heart of the dispute was

signed in California, for the purpose of insuring against disability that could arise

from activities in California, while domiciled in California.  *See* Memorandum at 6-7.

Further, he argues "[t]he accident giving rise to the disability that mandated coverage

-10-

by Plaintiff occurred in San Francisco, California.  Initial medical treatment for the accident was in San Francisco." *Id*. at 6.  Jefferson acknowledges his contacts in Texas, but argues that "standing alone, [they] do[] not establish sufficient 'minimum contacts' to support a ruling that Jefferson should be subjected to the jurisdiction of Texas for litigation over the parties' rights and obligations under the insurance policy--which covered his activities in California." *Id*. at 6-7.

Atlantic, the non-resident plaintiff, counters by pointing to the months of treatment Jefferson received in Texas, arguing that he "availed himself to the state of Texas by voluntarily treating with multiple doctors during this recovery and submitting the medical records for these doctors to [Atlantic] seeking reimbursement under the policy."  Response at 5-6.  "Further, in submitting his claim . . . under the policy at issue in this lawsuit, [Jefferson] provided [Atlantic] with a Texas address, and requested that all payments be mailed to this address . . . ."  *Id*. at 7.  Atlantic thus summarizes its argument: "based upon [Jefferson's] unilateral actions in seeking medical care [in Texas] and requesting that all correspondence regarding his medical care and disability payments be mailed to a Texas address, [Jefferson] is subject to the jurisdiction of this Court."  *Id*. at 7-8.  Atlantic further argues that it would be fair for Texas courts to exercise jurisdiction over Jefferson because he "voluntarily traveled to Texas for his care, such that appearing in Texas would not create a burden on [Jefferson]."  *Id*. at 8.

-11-

Jefferson does not appear to dispute that he maintained "contacts" with Texas. He did voluntarily come to Texas to receive medical treatment from Texas professionals. Thus, Jefferson "purposefully availed" himself of the state of Texas. Again, it does not appear Jefferson disputes this point. That alone does not create jurisdiction over him, however. It is one-third of the total equation. See *Luv N' care*, 438 F.3d at 469 ("the personal jurisdiction inquiry [is] a convenient three-step analysis: '(1) whether the defendant . . . purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable."). The court must decide whether the second and third steps have been satisfied.

The Supreme Court recently handed down further clarification of specific in-personam jurisdiction doctrine. In *Ford Motor Company v. Montana Eighth Judicial District Court*, 592 U.S. ____, 141 S. Ct. 1017 (2021), the Supreme Court examined both the underlying values of personal jurisdiction doctrine and the "arises out of" and "fair and reasonable" prongs of analysis. "These rules derive from and reflect two sets of values–[1] treating defendants fairly and [2] protecting 'interstate federalism.'" *Id*. at 1025 (quoting *World-Wide Volkswagen Corporation v. Woodson*, 444 U.S. 286, 293 (1980)). "[O]ur doctrine . . . provides defendants with 'fair

-12-

warning'–knowledge that 'a particular activity may subject [it] to the jurisdiction of a foreign sovereign' . . . And this Court has considered alongside defendants' interests those of the States in relation to each other . . . The law of specific jurisdiction thus seeks to ensure that States with 'little legitimate interest' in a suit do not encroach on States more affected by the controversy." *Id*. (quoting *Bristol-Myers*, 137 S. Ct. at 1780 ("Assessing this burden obviously requires a court to consider the practical problems resulting from litigating in the forum, but it also encompasses the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question.  As we have put it, restrictions on personal jurisdiction 'are more than a guarantee of immunity from inconvenient or distant litigation.  They are a consequence of territorial limitations on the power of the respective States.'")).

In addition, the Supreme Court previously enumerated factors for lower courts to consider in the context of contract litigation.

> The Court long ago rejected the notion that personal jurisdiction might turn on 'mechanical' tests . . . or on 'conceptualistic . . . theories of the place of contracting or of performance.'  Instead, we have emphasized the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'  It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

*Burger King*, 471 U.S. at 478-79.  The Fifth Circuit has used these factors to develop a doctrine focused on identifying the "hub" of the parties' contract.  See *Moncrief Oil International Inc. v. OAO Gazprom*, 481 F.3d 309, 312-13 (5th Cir. 2007); *Special Industries, Inc. v. Zamil Group Holding Company*, 578 Fed.Appx. 325, 330 (5th Cir. 2014) ("Saudi Arabia was the 'hub' of the parties' activity, not Texas."), *cert. denied*, 574 U.S. 1155 (2015).

The Fifth Circuit's hub doctrine may itself be dispositive here.  Again, Atlantic's entire argument can be summarized by this quotation from its brief: "[Jefferson] provided [Atlantic] with a Texas address, and requested that all payments be mailed to this address on multiple occasions.  Therefore, based upon his unilateral actions in seeking medical care [in Texas] and requesting that all correspondence regarding his medical care and disability payments be mailed to a Texas address, [Jefferson] is subject to the jurisdiction of this Court."  Response at 7-8.  The Fifth Circuit's response: "'[a]n exchange of communications in the course of developing *and carrying out a contract* also does not, by itself, constitute the required purposeful availment of the benefits and protections of [a forum state's] law' . . . Although AREC *sent payments to Louisiana*, this court has previously indicated that payments are also insufficient to establish minimum contacts with the state."  *Jones v. Artists Rights Enforcement Corporation*, 789 Fed.Appx. 423, 426 (5th Cir. 2019) (emphasis added) (quoting *Moncrief*, 481 F.3d at 312).  That said, both *Jones* and

-14-

*Moncrief* concerned in-state plaintiffs suing out-of-state defendants who had made payments and communications into the contested forum.  That is not the situation before the court now.  Therefore, the court will continue with further analysis.

Previous applications of the hub doctrine have focused on where the contract was negotiated, the place of performance (contemplated at the time of contracting), the residency of the parties to the contract, and contractual language pointing to specific jurisdictions.  See *Special Industries, Inc.*, 578 Fed.Appx. at 329-30 (citing *Moncrief*, 481 F.3d at 310-13).  In particular, "great weight" is given to a choice of law provision.  See *id*. at 329.

The contract in this case was executed in California.  The purpose of the contract was to insure against disability that could arise from Jefferson's activities in California.  Jefferson was a resident of California (and still is) at the time of contracting.  Presumably, Jefferson made payments from California.  The accident that led to this dispute occurred in California.  Neither party argues that they considered Texas as a place of performance when they entered into the contract. Jefferson appears to be making his extension requests from California.  On the other hand, Atlantic has no ties to Texas.  And, critically, Atlantic has not shown that the policy contains any choice of law provision, never mind a Texas choice of law provision.  Nearly everything about this contract and relationship points to California.  The "hub" of this contract, comparatively speaking, is California.  The

-15-

facts Atlantic relies on occurred after Jefferson purchased the policy.  Even if they are relevant as "actual course of dealing" evidence, they are comparatively minimal.

However, the case law cited above, including *Burger King*, was in the context of breach of contract litigation, not a declaratory judgment action.  As a result, there may be nuances in the contacts analysis that warrant further attention.  Also, the court notes that the Fifth Circuit's hub doctrine may be inconsistent with Supreme Court precedent.  The Fifth Circuit consistently refers to "the hub" of a contract, indicating one, and thus implying one constitutionally permissible forum for contract litigation.  See e.g., *Moncrief*, 481 F.3d at 312-13; *Special Industries, Inc.*, 578 Fed.Appx. at 330 ("Saudi Arabia was *the 'hub'* of the parties' activity, not Texas.") (emphasis added).  The *Burger King* opinion, however, suggests that multiple forums could be constitutionally permissible in contract litigation, specifically acknowledging that both Florida and Michigan were appropriate forums for resolution of that litigation.  See *Burger King*, 471 U.S. at 483 ("[The defendant] has not demonstrated how Michigan's acknowledged interest might possibly render jurisdiction in Florida *unconstitutional*.") (emphasis added).  Given this potential inconsistency[1] and the

---

[1]     A notable example of this potential inconsistency is the Fifth Circuit's decision in *Cardinal Health Solutions Inc. v. St. Joseph Hospital of Port Charlotte Florida, Inc.*, 314 Fed.Appx. 744 (5th Cir. 2009).  The facts of that case bore many similarities to *Burger King*, yet the court upheld a dismissal because the hub of the contract was Florida, not Texas.  One could argue that the hub of the contract in *Burger King* was Michigan, not Florida.  The Court held that did not prevent jurisdiction in Florida, however.

posture of this action, the court will turn now to a more thorough analysis of the contacts and their relationship to the specific dispute.

"The plaintiff's claims, we have often stated, 'must arise out of or relate to the defendant's contacts' with the forum . . . Or put just a bit differently, 'there must be an "affiliation between the forum and the underlying controversy"' . . . ." *Ford Motor Company*, 141 S. Ct. at 1025. The underlying controversy here is whether or not Atlantic has fulfilled the entirety of its contractual obligations to Jefferson. *See* Complaint at 7-8. In one sense, this controversy has no affiliation with Texas because the dispute materialized while Jefferson has been in California and a resident of California. That appraisal is likely too narrow, however.

This controversy has three components: (1) interpreting the policy, (2) determining the extent of Atlantic's performance, and (3) deciding whether Jefferson is entitled to CTD benefits. See *id*. at 8. Parsing these components carefully reveals that, out of the three, only Atlantic's performance has an affiliation with Texas. The policy was negotiated and executed in California. The Texas events have no bearing on the court's interpretation of the contract. Jefferson could have sought medical care and requested that payments be sent to any of the 50 states and it likely would not change how the court approaches the interpretation of the contract. Similarly, Jefferson's eligibility for CTD benefits requires an appraisal of his actions (or inaction) in California; his convalescence in Texas has no bearing on that

determination.  Thus, only the court's determination of Atlantic's performance has any affiliation with Texas.

Atlantic makes much of the fact that the majority of Jefferson's medical care was performed in Texas.  According to Atlantic, those treatments and evaluations along with the "resulting determination[s] of any TTD and AME [benefits] owed to [Jefferson]" create the necessary affiliation with Texas to support jurisdiction here. *See* Response at 3.  But it is unclear why the treatment and evaluations matter for determining Atlantic's performance.  Surely Atlantic would still argue that it fully performed even if it had made benefits payments for 104 weeks *without* evaluating the records Jefferson had sent to it.  Put another way, Atlantic would still bring this suit even if it never reviewed the records produced by Texas entities before issuing benefits to Jefferson.  Atlantic wants a declaration that it did in fact make the benefits payments it was obligated to make, not whether those payments were supported by proper medical records.  The Texas medical treatments and evaluations thus appear "attenuated" from the current controversy.  See *Burger King*, 471 U.S. at 475; *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009) ("The defendant 'must not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts' . . ."), *cert. denied*, 562 U.S. 827 (2010).  The most relevant contacts are the payments and correspondence that Jefferson requested be sent to him at a Texas address.

-18-

These contacts, however, still strike the court as minimally related to this litigation.  Jefferson has spent the majority of time since the accident in California, so it is unclear whether the payments sent to Texas even constitute a majority of the payments issued.  Further, Atlantic did not generate these payments in Texas.  Presumably, Atlantic sent them from outside of Texas into the state.  It is Jefferson's request for and receipt of the payments that occurred in Texas.  One could thus conclude that Atlantic's performance, the issue in the lawsuit, occurred outside of Texas.  While less attenuated than the medical evaluations that Atlantic relies on, these contacts are still a step removed from the actual substance of the current controversy.

Despite the paucity of the contacts Atlantic points to, the court acknowledges their relation to the controversy.  The court will thus assume, *arguendo*, that these contacts could in fact support jurisdiction in Texas.  The next step of the analysis is to evaluate the fairness and reasonableness of maintaining jurisdiction over Jefferson.  See *Luv N' care, Ltd.*, 438 F.3d at 469; *Burger King*, 471 U.S. at 474-78.

The Supreme Court and the Fifth Circuit have identified several relevant factors for evaluating fairness and reasonableness.  These factors include (1) the burden on the defendant, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining efficient resolution, (5) the shared

interests of the several states "in furthering fundamental substantive social policies . .

. ." *World-Wide Volkswagen*, 444 U.S. at 292; see also *Burstein v. State Bar of*

*California*, 693 F.2d 511, 520-21 (5th Cir. 1982).  Further, these factors impact the

relative weight of the jurisdictional contacts.  See *Burger King*, 471 U.S. at 476

("Once it has been decided that a defendant purposefully established minimum

contacts within the forum State, these contacts may be considered in light of other

factors to determine whether the assertion of personal jurisdiction would comport

with fair play and substantial justice.") (internal quotations omitted); *see also* 4

WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1067.1 (3d ed. 2002)

("[*World-Wide Volkswagen*] suggests that the nature and amount of 'minimum

contacts' required to support jurisdiction may vary from case to case, and that the

variance will be mediated by the enumerated relevant factors.").  The recent *Ford*

*Motor Company* decision makes clear that "interstate federalism" plays a central role in

this analysis.  See *Ford Motor Company*, 141 S. Ct. at 1025; *see also* Wright & Miller,

*supra*, § 1067.1 ("These factors can be viewed, at least in part, as representative of the

continuing role played by the historic notions of state sovereignty and interstate

federalism in personal jurisdiction jurisprudence.").  These factors weigh heavily in

Jefferson's favor.  As such, they diminish the weight of the Texas contacts and thus

point decidedly towards dismissal.

　　　　We begin with the burden on Jefferson.  Atlantic is correct that mere

-20-

inconvenience is not enough to overcome litigation related contacts and purposeful availment.  It was merely inconvenient for the defendant in *Burger King* to travel to Florida from Michigan given the extent of the ongoing business relationship between the Michigan based defendant and the Florida based plaintiff.  See *Burger King*, 471 U.S. at 479-81 (pointing to the "carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with [plaintiff] in Florida.").  No such ongoing relationship exists here.  Jefferson came to Texas to convalesce and receive treatment.  He has since left Texas with no apparent plans for returning.  In other words, his purpose for coming to Texas has been fulfilled.  Nothing suggests he has any sort of continuing relationship with any entity in Texas.  Arguing, as Atlantic does, that because Jefferson "voluntarily traveled to Texas for his care, such that appearing in Texas would not create a burden"[2] severely discounts the burdens he would face and the differences between this case and the facts of *Burger King*.  Traveling to Florida would not halt the *Burger King* defendant's operations in Michigan, whereas Jefferson must effectively pack up his life every time he travels to Texas.  Further, Atlantic disregards that presumably Jefferson could previously travel to Texas *because* he was being supported by Atlantic's benefits payments, now unavailable to him.

Atlantic attempts to tilt the third and fourth fairness factors in its favor by

---

[2]      Response at 8.

arguing "witnesses in regard to the treatment [Jefferson] received, the medical bills he incurred, as well as his need for additional treatment are located in Texas." Response at 8. There are several defects in this argument. First, Atlantic does not explain why those records or witnesses are needed to determine whether it performed its obligations under the contract. Second, this argument ignores the witnesses and evidence likely in California. Just to name a few, there are the medical professionals who provided Jefferson with initial treatment, the witnesses and evidence related to the accident, and whatever financial records Jefferson maintains in California. On top of that, Jefferson has returned to live in California. It appears Jefferson has not had any treatments in Texas for more than a year now. Why would witnesses with regard to Jefferson's "need for additional treatment" be located in Texas? Why would witnesses, who have not seen Jefferson for some time, and whose evaluations substantiated *temporary* disability benefits, be proper witnesses for testifying about *permanent* disability or ongoing treatment? It seems more likely that witnesses with that information are actually located in California. Both Atlantic's and the judicial system's interests in convenient and effective resolution of this matter seem to point towards California, not Texas.

Finally, there are the "principles of 'interstate federalism'" and the forum states' interest in adjudicating the dispute, which the Supreme Court recently reminded us play a critical role jurisdictional analysis. See *Ford Motor Company*, 141

S. Ct. at 1025 ("[T]his Court has considered alongside defendants' interests those of the States in relation to each other . . . [and] thus seeks to ensure that States with little legitimate interest in a suit do not encroach on States more affected by the controversy.") (internal quotations omitted).

Put bluntly, Texas has next to no interest in *this particular* controversy, for reasons that should now be clear based on the forgoing discussion.  Neither party is a resident of Texas.  Atlantic does not explain how any Texas entity or resident would be impacted by resolution of this dispute.  On the other hand, the contract at issue was executed in California.  It was offered to Jefferson as a California resident to cover his activities in California and to insure against injury that could occur in California.  Jefferson remains a citizen of California and the accident triggering coverage occurred in California.  California thus has significant interest in this matter, while Texas has comparatively little.  See *Bristol-Myers*, 137 S. Ct. at 1780 ("[Specific jurisdiction doctrine] encompasses the more abstract matter of submitting to the coercive power of a State that may have *little legitimate interest* in the claims in question . . . [It is] a consequence of territorial limitations on the power of the respective States.") (emphasis added).

"For each of those States, the suit involves all out-of-state parties, an out-of-state accident, and out-of-state injuries; the suit's only connection with the State is that a former owner . . . bought the car there." *Ford Motor Company*, 141 S. Ct. at

1030.  Substitute "each of those States" with "Texas" and "former owner bought the car there" with "Jefferson convalesced there," and the facts of *Ford Motor Company* map closely onto the facts of this case.  Given the relative dearth of litigation related contacts with Texas, the demands of interstate federalism require Texas courts to relinquish any claim to jurisdiction over this matter.  Consequently, this court is without jurisdiction, and Jefferson's motion to dismiss is granted.

## III.  CONCLUSION

For the reasons set forth herein, Jefferson's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction is **GRANTED**.

**SO ORDERED.**

April 14, 2021

_A. Joe Fish_

**A. JOE FISH**
**Senior United States District Judge**